Kane, Robert J., J.
Plaintiff West Waters (“Waters”) brings this action against defendants EarthLink, Inc. (“EarthLink”) and OneMain.com, Inc. (“OneMain”) for breach of contract (Count I) and violation of G.L.c. 93A (Count II). The matter is before this court on Waters’ motion to certify this case as a class action. For the following reasons, this motion is DENIED. 
BACKGROUND
Based on the pleadings, expert reports and testimony, affidavits, and other supporting documents before this court, the following constitute the facts as gleaned from the record.
Cape Internet and New England Access (“New England”) were Internet service providers (“ISPs”) that provided Internet access, e-mail service, and web hosting service to customers on Cape Cod and the Islands, the rest of Massachusetts, Rhode Island, and New Hampshire. Customers paid a monthly fee in exchange for the services their ISPs provided.
In September 1999, OneMain, one of the largest ISPs in the United States, purchased Cape Internet and New England. At the time of the purchase, there were approximately 18,000 Cape Internet and New England customers who would become OneMain customers. Simultaneously, OneMain purchased other local ISPs around the country. In total, OneMain added approximately 78,000 new customers to its national network of service as a result of those purchases.
On June 7, 2000, EarthLink purchased OneMain and its subsidiaries, which included Cape Internet and New England; EarthLink thereby increased the number of its customers from 3.5 million to 4.2 million. EarthLink’s new customers were bound by the *528 EarthLink Internet Services Agreement, which was effective on March 7, 2000.[2]
In 1998, Waters, who owns a business and lives on Cape Cod, executed a service agreement with Cape Internet for unlimited Internet service. He also subscribed to Cape Internet for its commercial web hosting service and thereby created his futon business website.[3] Waters remained a Cape Internet customer after OneMain purchased it; he continued to pay for e-mail services and a separate fee for commercial web hosting services. When EarthLink purchased OneM-ain, Waters continued as a subscriber to EarthLink’s Internet access and e-mail services and to its commercial web hosting service. Waters stopped paying for service around March 2001. In July 2001, EarthLink terminated Waters’ account for nonpayment.
Waters alleges that EarthLink was not prepared to integrate its new customers’ accounts. As a result, some EarthLink customers experienced difficulties connecting to Internet, sending or receiving e-mail, and accessing web pages.[4]
E-mail
An e-mail message, at its most basic, is data transmitted from one computer to another computer using a network of computers, the Internet. All data transmitted between computers, including e-mail messages, travels in small packages, “packets.” Each packet moves within the network along the best available route at the time. This system, “packet-switching,” results in a variety of possible routes for each packet, depending on factors like the number of packets attempting to move in the network at one time. Two people may each send an e-mail to a third person at the exact same time; even though both are using the same Internet service provider, they potentially have different experiences because their messages will not necessarily travel the same path through the network.
Waters’ expert, Gregory Girard (“Girard”), describes e-mail systems in his report as:
Being a mix of hardware, software and network interface devices of varying capacities spread out over a number of physical locations, the e-mail system as a whole might offer acceptable performance for some pathways and not others, perhaps acceptable at certain times of the day and with certain sizes of e-mail messages, while offering unacceptable performance for other pathways at certain times of the day and with certain sizes of e-mail messages. The mix of e-mail users accessing the system and from which locations accounts for one level of uncertainty, while the actual size of the e-mails, including attachments provides another level of uncertainty. Weather conditions effect (sic) the likelihood of users accessing e-mail, and the degree of broadband penetration in a region dramatically effects (sic) the size of e-mail messages that individuals are likely to send or try to receive.
In October 2000, EarthLink notified OneMain customers that EarthLink would be integrating their e-mail accounts. Waters alleges that EarthLink failed to construct an infrastructure adequate to support the influx of customers at the time of its purchase of OneMain and its subsidiaries. EarthLink concedes that there were inadequacies in the e-mail services due to insufficient capacity to handle the volume of data being transmitted. Girard asserts that EarthLink’s e-mail system in the Cape Cod region operated with moderate impairment for four months and severe impairment for another four months, from September 2000 until August 2001.[5] He attributes this impairment to the fact that e-mail services were supported by a single computer and that the system used obsolete software. Girard argues that this single-server e-mail system caused the same negative results for all customers. The record does not indicate, however, that all 18,000 potential class members subscribed to e-mail service or that they did in fact experience negative effects.
Another cause of problems associated with e-mail service was that OneMain’s mail systems did not block spam, which created circumstances wherein up to 30-40% of the mail queue would be spam.[6] The influx of spam caused periodic delays in the delivery of e-mail. During February and March 2001, the defendants took remedial steps to improve e-mail services and reduce spam. By March 2001, EarthLink asserts that only some customers may have experienced periodic delays in their service.
On October 24, 2000, Internet access and e-mail service was temporarily shut down from 12:00am until 6:00am, in order to conduct the physical changes necessary to integrate Cape Internet and New England e-mail accounts to the OneMain system.[7] Any issues or disruptions in service resulting from these changes were described by an EarthLink employee as “spotty” and “inconsistent.” During the week prior to November 6, 2000, e-mail service was down for five hours. On January 21, 2001, a blizzard on Cape Cod caused power outages in certain areas, which affected the servers in those areas. Only customers whose computers were directly linked to those servers were affected by the power outages. In February 2001, an EarthLink executive described the e-mail issues as intermittent and affecting “various,” but not all, OneMain customers.
On March 14, 2001, the OneMain e-mail system was down from 2am to 3am for a system hardware upgrade.[8] On May 3, 2001, there was a OneMain e-mail system outage due to a local area network (“LAN”) hardware failure. In July 2001, about 4,000 customers could not access the Internet or their e-mail accounts when their passwords were accidentally scrambled due to a processing error. Customers were notified of the problem and directed to its solutions by individual telephone calls. Waters himself did not *529 experience delays in e-mail delivery or loss of e-mail messages as a result of the above described problems with the system.
By the end of August 2001, EarthLink centralized its e-mail service elements at a facility in Pasadena, California. E-mail service has been adequate since September 2001 because of the success of the centralization of these service elements.
Web hosting
In the fall of 2000 and winter of 2001, EarthLink decided not to integrate the web pages of Cape Internet and New England customers because of incompatibility between EarthLink’s platforms and those of Cape Internet or New England. Therefore, the web hosting services remained on the Cape Internet servers located on Cape Cod.
On May 2, 2001, EarthLink informed former Cape Internet customers, who subscribed to Cape Internet for web hosting service, that the service would be terminated on June 10, 2001. EarthLink advised the subscribers that they could transfer their accounts to EarthLink or subscribe to another ISP for web hosting service. Otherwise, on July 10, 2001, any files that customers had not yet transferred were scheduled to be deleted; access to web pages was not actually disabled until July 25, 2001.[9]
Waters was unable to access the content of his web page beginning as early as October 2000. He asserts that it was therefore impossible for him to upload the content of his web page to the EarthLink server. He alleges that other customers were unable to access their web pages as well. For example, one customer enlisted a new web hosting service provider, but EarthLink was unable to shut down the old web page. This resulted in potential confusion to whomever searched for the website, who would find either the old or the current web page. Waters asserts that a probable reason for web hosting problems was poor maintenance of “Webserver farms” by EarthLink and OneMain.[10]
EarthLink and OneMain contend that numerous former web hosting subscribers transferred their web addresses to EarthLink servers without incident. Their records indicate that some former OneMain customers experienced problems with their Internet service and called to complain. There is no record, however, which will accurately provide a list of customers who actually did experience problems with Internet service and did not call customer service. EarthLink records are limited to information regarding who subscribed to web hosting services, who paid for those services, and who called customer support with any issues, concerns, or problems.
Customer Service
These problems were allegedly exacerbated by the difficulties that customers faced in contacting customer service at the defendants’ call centers.[11]
PROCEDURAL BACKGROUND
On August 1, 2001, Waters filed this complaint against OneMain and EarthLink. On November 5, 2001, OneMain and EarthLink removed this action to the United States District Court of Massachusetts; they argued that there was an enforceable agreement to arbitrate. The District Court found that the defendants had failed to prove an agreement to arbitrate. On October 31, 2003, the United States Court of Appeals, in a per curiam opinion, affirmed the District Court’s decision.
During the pendency of the action in the District Court, the parties engaged in discovery. On June 9, 2004, Waters moved for class certification. On June 17, 2005, the District Court remanded this action to the Barnstable Superior Court.
On October 27, 2005, Waters filed a motion for class certification. On December 20, 2005, the Court heard argument on the motion. On January 24, 2006, this court issued Instructions for Further Submissions on Class Certification Motion. The court sought information on (1) contracts by OneMain and EarthLink for Internet services (access, e-mail, and web hosting); (2) any records or methods of proof showing that OneMain or EarthLink customers experienced an inability to receive or send e-mail on a class-wide basis; (3) any records or other methods of proof showing OneMain or EarthLink customers’ difficulties with their web hosting services on a class-wide basis; and (4) any records or other method of proof showing customers’ inability to access the Internet on a class-wide basis.
On April 13, 2006, this court held an evidentiary hearing to clarify the issues involved in this motion for class certification. Both parties submitted further memoranda, as requested by this court, presenting arguments regarding whether common issues of fact and law predominate.
DISCUSSION
Waters seeks to certify this case as a class action pursuant to Mass.R.Civ.P. 23 and G.L.c. 93A. The class for which he seeks certification includes:
All former Cape Internet and New England Access customers whose accounts were sold or otherwise transferred by Cape Internet and/or New England Access to OneMain and acquired by EarthLink.
Mass.R.Civ.P. 23
In order to certify a case as a class action, Mass.R.Civ.P. 23(a) prescribes four criteria: (1) numerosify, (2) commonality, (3) typicality, and (4) adequate representation.[12] Mass.R.Civ.P. 23(a). The court must also find that “the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.” Mass.R.Civ.P. 23(b). This court may exercise broad discretion in its determination of whether to *530 certify this case as a class action. Weld v. Glaxo Wellcome, Inc., 434 Mass. 81, 84-85 (2001), citing Brophy v. School Comm. of Worcester, 6 Mass.App.Ct. 731, 735 (1978). The burden rests on the plaintiff to set forth evidence “sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements of rule 23.” Id. at 87.
Numerosity
Waters seeks to certify a class composed of approximately 18,000 people; this number is sufficiently large to meet the numerosity requirement imposed by Rule 23(a) because joinder of that many plaintiffs clearly would be impractical. Rodrigues v. Members Mortgage Co., Inc., 226 F.R.D. 147, 150 (D.Mass. 2005) (noting that a class of 40 has been deemed sufficient to satisfy this requirement) (citations omitted).
Commonality
Waters successfully establishes commonality in this case. Whether EarthLink’s and OneMain’s alleged conduct constituted a breach of contract and unfair or deceptive conduct as to the former Cape Internet and New England customers presents questions of fact and law common to the potential class.
Typicality
Typicality exists where there is “a sufficient relationship . . . between the injuiy to the named plaintiff and the conduct affecting the class” and where the same legal theory operates as the basis for the claims of both the representative and the members of the class. Weld, 434 Mass. at 87, quoting 1 H. Newberg, Class Actions §3.13, at 3-75. In general, a plaintiff establishes typicality when she can show that the defendant acted consistently toward both the representative and the members of the class. Id.
Waters’ claims are typical of the class he seeks to certify. The conduct of which he complains was an alleged failure to provide adequate Internet services. This conduct gives rise to the same legal and remedial theories for the entire class: breach of contract and violation of the consumer protection statute. There is a sufficient relationship to establish typicality in this case.
EarthLink and OneMain argue that Waters’ claims are specific to his commercial web hosting service account and therefore are not typical of the entire class, which includes customers who did not subscribe for commercial web hosting services. However, the focus of the typicality analysis is on the conduct of the defendant and the legal claims of the plaintiff. Typicality is established when the plaintiff convinces the court that defendants acted consistently toward both the representative and the class members. Waters succeeds on this element.
Adequate Representation
The parties do not dispute whether Waters and his attorney would adequately represent a potential class.
Predominance
Courts must engage in a thorough analysis of the legal and factual allegations of a case in order to determine whether to certify a class action; this analysis includes looking beyond the pleadings and being mindful of the structure of the underlying causes of action. Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 166-69 (3d Cir. 2001) (“Inreviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action”).[13] Here, the relevant underlying claim is for breach of contract.
The essential elements of a cause of action for breach of contract are the existence of a valid agreement, a breach of that agreement, and harm that results from that breach. Singarella v. Boston, 342 Mass. 385, 387 (1959); Michelson v. Digital Financial Services, 167 F.3d 715, 720 (1st Cir. 1999). Whether harm resulted from the defendants’ alleged conduct is a question that must be answered in the course of Waters’ breach of contract claim. This question cannot be answered for the class as a whole without myriad individual inquiries.
Waters correctly asserts that individual questions regarding the amount of damages will not preclude class certification. A class action remains an appropriate vehicle for relief even when individual questions of the amount of damages exist for each potential class member. Weld, 434 Mass. at 92, citing In re One Bancorp Sec. Litig., 136 F.R.D. 526, 533 (D.Me. 1991). There is an important distinction, however, between the extent of harm and the existence of harm. Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 189 (3d Cir. 2001) (“the issue is not the calculation of damages but whether or not class members have any claims at all”).
When the court must inquire not only into the extent of harm but also into whether any harm actually resulted, then individual questions predominate and class certification is not appropriate. Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 188 (3d Cir. 2001) (“Where proof of fact of damage requires evidence concerning individual class members, the common questions of fact become subordinate to the individual issues, thereby rendering class certification problematic”); Hoang v. E*Trade Group, Inc., 151 Ohio App.3d 363, 368-71 (Ohio App. 2003) (decertifying a class because the plaintiffs claims required proof that each member of the potential class suffered a harm caused by defendant’s alleged wrongdoing); Solomon v. BellAtlantic Corp., 9 A.D.3d 49, 55-56 (1st Dept. 2004) (decertifying a class where the proof of injuiy, its nature, cause, and extent would require a series of individual trials for each potential class member).
“Although common questions need not be disposi-tive of the entire class action . . . their resolution *531 should at least provide a definite signal of the beginning of the end.” Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 603 (1985), quoting Mertens v. Abbott Laboratories, 99 F.R.D. 38, 41 (D.N.H. 1983). The common questions that require resolution in this case include, but are not limited to: (1) whether EarthLink and/or OneMain had a contractual duty to provide adequate Internet access, e-mail service, and/or web hosting service; and (2) whether the alleged conduct of EarthLink and/or OneMain is true and constitutes a failure to perform as required by the contract. The resolution of these issues hardly signals the beginning of the end; what lies ahead is a series of up to 18,000 individual inquiries as to proof of harm and its cause.
Access
Waters fails to present any evidence that a group of customers who experienced harm as a result of EarthLink’s and OneMain’s conduct could be gleaned from some set of business records or data. Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 40 (1st Cir. 2003) (“Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria — thus rendering unnecessary an evidentiary hearing on each claim”). Even if all 18,000 customers actually experienced interruptions in service, the relevant inquiry would be fractured yet again by the variety of factors that may have caused the interruptions. The record indicates that some customers were unable to access the Internet because of their own nonpayment, because of weather particular to their location, and because of the hardware and/or software that varies from customer to customer. Any claim for a breach of contract based on the alleged class-wide interruptions of Internet access will necessarily involve a customer-by-customer analysis regarding harm and causation.[14]
E-mail
Similarly, Waters fails to show that there was class-wide harm with regard to e-mail service. Some customers did not subscribe to OneMain or EarthLink for e-mail service. Of the email service subscribers, some may not have experienced any delays in the receipt or delivery of their e-mail messages. As noted above, each customer uses a different computer, with different software and hardware; e-mail messages travel different paths in the same network; even the weather affects the adequacy of e-mail systems.
Even if this court were to limit the class to those customers who subscribed for e-mail service and experienced a loss caused by defendants’ alleged conduct, the task of identifying which customers qualify as members of the class would require individual inquiries of the 18,000 former Cape Internet and/or New England customers. Southern Bell Tel & Tel Co. v. Wilson, 305 So.2d 302, 304 (Fl.App. 1974) (decertifying a class where the identity of the members of the class required an inquiry as to whether each customer experienced an interruption in her telephone service). All members of the class were clearly not harmed the same way, if at all, and individual questions of fact predominate.
Web Hosting
Individual questions of fact predominate in the context of web hosting services as well. Waters alleges that he experienced a loss when he was unable to access his web site, which impaired his ability to transfer the data to the EarthLink servers. Yet, the potential class would include members who did not subscribe to Cape Internet for web hosting services. Further, numerous members of the potential class who actually did subscribe for web hosting services may not have experienced any loss. This inconsistency of experience within the potential class would create the need, yet again, for individual inquiries.
EarthLink records could provide a list of web hosting customers who complained of difficulties in the process of changing from Cape Internet to EarthLink. However, such records would not accurately describe the actual number of customers who had negative or positive experiences with the web hosting server change; the list would be limited to those who complained. The court’s resources would be required to conduct individualized inquiries among the potential class members. Therefore, class certification is not appropriate.
Chapter 93A
Waters also seeks class certification pursuant to G.L.c. 93A alleging that EarthLink’s and OneMain’s failure to provide adequate Internet access and customer service constituted unfair and deceptive business practices. Waters may bring this action on behalf of a class of “numerous” “similarly situated” persons if the defendants’ allegedly unfair or deceptive act “caused similar injuiy” to them. G.L.c. 93A, §9(2).[15] The Mass.R.Civ.P. 23(a) requirements provide a useful framework for a G.L.c. 93A class certification analysis, but the motion judge may employ a level of discretion in the analysis that is not limited by the boundaries of Rule 23(a). Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 605-07 (1985).
Proof of injury and its causal connection to EarthLink’s and OneMain’s conduct is essential to Waters’ G.L.c. 93A cause of action. Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 445 Mass. 790, 791 (2006). As discussed above, the court will be forced to examine each subscriber’s individual experience with regard to injuiy to determine whether there was a violation of the consumer protection statute. Cf. Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 392 (2004) (“if the plaintiffs’ allegations proved true, all of the members of the certified class would have suffered a similar injury that would most effectively be redressed through a G.L.c. 93A consumer class action”). It is well within this court’s discretion to determine that class certification is inappropriate here.
*532 Waters argues that the injury was a class-wide inability to connect to the Internet when the class had paid for the service of access to the Internet. However, the potential inability to access the Internet does not by itself effect a loss. “A consumer is not. . . entitled to redress under G.L.c. 93A, where no loss has occurred. To permit otherwise is irreconcilable with the express language of G.L.c. 93A, §9, and our earlier case law.” Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 445 Mass. 790, 802 (2006). See also Hoang v. E*Trade Group, Inc., 151 Ohio App.3d 363, 371 (Ohio App. 8 Dist. 2003) (noting that the law does not provide recovery for inchoate claims).
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiff West Waters’ Motion to Certify a Class Action against defendants EarthLink, Inc. and OneMain.com, Inc. for breach of contract (Count I) and violation of G.L.c. 93A (Count II) is DENIED.

The EarthLink Internet Services Agreement stated, in pertinent part, “EarthLink, Inc. (“EarthLink”) provides its Internet services . . . (Services) to users who pay a monthly service fee to subscribe to the Services (“Members”)... If you do not agree to the terms and conditions of this Agreement, including any future revisions . . . you must terminate your use of the Services under Section 10.”
The Agreement further provides a disclaimer of liability that reads, “[t]he Services are provided on an ‘as is’ and ‘as available’ basis. EarthLink does not warrant that the Service will be uninterrupted, error-free or free of viruses, or other harmful components.”
The Agreement has been modified since this March 7, 2000 version. However, all subsequent versions also contained the disclaimer.

Anyone may create her own web address with a unique, registered domain name. A web address requires a name server; the owner of a web address may host his address on his own server, or he may pay an ISP to host it. When a customer subscribes to an ISP for its web hosting service, the customer’s web address, or domain name, resides on the ISP’s server.
“Web address,” “website,” and “web page” are synonyms used interchangeably throughout this opinion.

Waters also contends that EarthLink demanded that all customers switch e-mail addresses and web addresses to EarthLink or their services would be terminated. Web addresses have domain names that are registered and unique; they belong solely to their registered owners. An ISP may change the server that hosts the web address, thereby changing the location of the data from the web address. However, even when a web address is moved, or uploaded, onto a new server, all rights to the web address, or domain name, remain with the owner. Therefore, an ISP cannot force a customer to change her web address or domain name, merely the location of the address.

Girard uses the terms “adequate,” “moderately impaired,” and “severely impaired” to describe e-mail service but notes that they are not based on any recognized industry standard. They are not based on any objective, quantitative measures of e-mail performance. Each term refers to the level of customer satisfaction with the ISP, EarthLink, as determined by Girard.

“Spam” is a term that describes unsolicited e-mail messages that subscribers receive. It is a type of e-mail that is usually sent to thousands of e-mail addresses at one time.

OneMain communicated with customers the information regarding the temporary shutdown: “the transition will take place from approximately 12:01a.m. to 6:00 a.m. EDT, Tuesday, October 24. During this time, you will not be able to surf the Internet, send or receive e-mail or access newsgroups.”

A message was posted notifying any users who were on the system at that early morning hour: “Legacy OneMain Electronic Mail Service is undergoing upgrade. We apologize for any inconvenience this may pose.”

Waters alleges that not all customers received notice of this shutdown of Cape Internet’s servers. EarthLink, however, responds that there is no way of knowing whether or not each customer actually received notice that the Cape Internet servers were going to be shut down.

A Webserver farm’s purpose is to provide web hosting service. They are located all over the country. A poorly maintained Webserver farm could result in equipment failure or exceeding capacity, which could result in customers experiencing a degradation of service. In the most extreme case, a web site may become unavailable.

Waters alleges that up to 80% of dissatisfied customers who contacted customer support at EarthLink ended the call before they reached technical support.

“One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.” Mass.R.Civ.P. 23(a).

Because Mass.R.Civ.P. 23 was “written in light of the Federal rule,” federal case law interpreting the Federal rule provides helpful insights for this court’s analysis. Carpenter v. Suffolk Franklin Savings Bank, 370 Mass. 314, 318 (1976); Baldassari v. Public Fin. Trust, 369 Mass. 33, 40 (1975).

Girard suggests that regardless of the differences among customers’ service agreements, the services each ISP offered should be characterized as general, core Internet services: Internet access, e-mail, and web hosting. This court declines to adopt that characterization. All customers did not subscribe to their ISP for all three services or even the same combination of services. Each customer had a different experience and relationship with her ISP depending on which of the services the ISP provided her. Similarly, a dance studio that offers ballet, jazz, and modem dance classes provides all of its students the service of dance instruction, but a student enrolled in the jazz class has a notably different experience than a student enrolled in the ballet class or in the modem dance class.

“Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; the court shall require that notice of such action be given to unnamed petitioners in the most effective practicable manner. Such action shall not be dismissed, settled or compromised without the approval of the court, and notice of any proposed dismissal, settlement or compromise shall be given to all members of the class of petitioners in such manner as the court directs.” G.L.c. 93A, §9(2).