**ATLANTECH INC., Plaintiff,**

v.

**AMERICAN PANEL CORP., APC Acquisition Corp., Inc., and Universal Avionics Systems Corp., Defendants.**

**Civil Action No. 07–10342–JLT.**

United States District Court,
D. Massachusetts.

March 24, 2008.

Michael G. Andrews, Irwin B. Schwartz, Business Litigation Associates, P.C., Boston, MA, for Plaintiff.

John A. Christy, Michelle Roback Kraynak, Schreeder, Wheeler & Flint, LLP, Michael J. King, Greenberg Traurig LLP, Atlanta, GA, John F. Farraher, Jr., Greenberg Traurig LLP, Justin P. O'Brien, Dwyer & Collora, LLP, Boston, MA, David M. Osborne, Federal Defenders Office, Philadelphia, PA, for Defendants.

## MEMORANDUM

TAURO, District Judge.

### Introduction

Plaintiff Atlantech Incorporated ("Atlantech") brings this action to obtain specific performance, injunctive relief and damages against Defendants in connection with the sale of certain specialized aircraft LCD displays. Presently at issue are three cross-motions for summary judgment and Atlantech's request for preliminary and permanent injunctive relief.[1]

### Factual Background

The relevant facts are as follows.[2] Atlantech is an export trading company that specializes in providing United States-

---

**1.** Atlantech's *Motion for Partial Summary Judgment* [# 89]; Defendant APC Acquisition Corporation's ("APC") *Motion for Summary Judgment* [# 98]; Defendant Universal Avionics Systems Corporation's ("Universal") *Motion for Summary Judgment* [# 102]; Atlantech's *Application for Preliminary Injunction* [# 29]. Also pending is APC's *Motion to Strike "Affidavit of Nathan Bellin in Support of [Atlantech's] Application for Preliminary Injunction"* [# 44].

**2.** These facts are presented in the light most favorable to Defendant APC, the party who does not prevail on summary judgment. *See Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 34 (1st Cir.2005) ("like the district court, we must scrutinize the record in the light most favorable to the summary judgment loser and draw all reasonable inferences therefrom to that party's behoof.")

manufactured aircraft LCD displays to foreign aircraft electronics manufacturers.[3] At the time of the events leading to this lawsuit, Atlantech typically purchased the LCD displays from Defendant American Panel Corporation ("American Panel"),[4] a wholly owned subsidiary of Defendant Universal Avionics Systems Corporation ("Universal"),[5] a company that designed, manufactured and finished the displays.

## A. 1040 LCD Displays and American Panel's Obligations

On December 2, 2003, Atlantech and American Panel entered into a Memorandum of Agreement ("MOA"), in which Atlantech purchased 103 APC 1040–100 AMLCDs displays from American Panel.[6] Several "Applicable Documents" were incorporated into the MOA, including: (1) a Purchase Order; (2) a Product Specification; (3) American Panel's Standard Terms of Sale; (4) a Purchase Agreement, and (5) a Support Agreement.[7]

In the "Reliability/Warranty/Support" section of the Product Specification, American Panel agreed as follows:

> This product shall be supported by the manufacturer for a minimum period of 10 years starting in 2002. In the event the Assembly is changed such that form, fit, or function, are affected, the manufacturer will notify the buyer and end user in writing 60 days prior to such chnges [sic]. In the event that the part is obsoleted at the end of the 10 year period, the manufacturer will notify the buyer and end user with sufficient advanced warning (for example 120 days assuming a 4 month lead-time) to prevent factory or field interruption. The manufacturer will make available prior to obsolescence, either the identification of a suitable alternative, or the opportunity for a "life time buy" at pricing commensurate at the time of obsolescence, or both.[8]

Similarly, in the "Administration" section of the Support Agreement, American Panel agreed as follows:

> 11.1 Discontinuance of Products
>
> In the event Manufacturer discontinues production of any Product, Manufacturer will provide notification to Customer/End User one hundred eighty (180) calendar days before such discontinuance . . . .
>
> 11.2 Length of Product Availability
>
> Manufacturer agrees to support original product through December 31, 2012. *At that point,* the product may be discontinued. If so, the Customer/End User shall be notified 180 days in advance of the planned obsolescence, and shall be permitted to a "Life Time Buy" at prices in line with prior purchase orders.[9]

American Panel also agreed, via the Support Agreement, to create "Data Warehouse Documents" for the product:

> 7.1.2 Component Maintenance Manuals

---

3. *See* Aff. of Nathan Bellin in Supp. of Mot. for Partial Summ. J. ¶ 2 ("Bellin Summ. J. Aff.") [# 92].

4. *See* Second Amended Complaint at 1 [# 73].

5. *See* Universal's Rule 56.1 Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. at 1 [# 104].

6. *See* Statement of Undisputed, Material Facts of Record Pursuant to Local Rule 56. 1, in Atlantech's Mem. of Law in Supp. of Mot. for Partial Summ. J at 2 ("Atlantech Summ. J.

Mem.") [# 90]; Memorandum of Agreement Between Atlantech and American Panel Corporation, Ex. A to Bellin Summ. J. Aff. ("Ex. A") [# 92–2].

7. *See* Memorandum of Agreement, Ex. A at 1.

8. *See* Product Specification, Ex. A at 21.

9. *See* Support Agreement, Ex. A at 53 (bold removed, italics added).

Manufacturer will create for Customer/End User, CMMs (or equivalently "Data Warehouse Documents") for each agreed to Product. In the event that the manufacturer discontinues the product, or fails to continue either servicing or production, the data held in the data safe including schematics and parts list, will be transferred to the end user.... [10]

These Data Warehouse Documents include the intellectual property necessary for the production, diagnostics and repair of the displays including schematics, parts lists, software, test programs and procedures, description of circuit operation, printed circuit board layouts, fixture design, troubleshooting information and special tests.[11]

### B. 1040–100 Displays Discontinued; 1040–725 Displays as Replacements

In 2004 or 2005, without notifying Atlantech, American Panel discontinued the 1040–100 display line.[12] APC did not make "form, fit and function replacements" available to Atlantech at that time.[13]

In July of 2005, however, American Panel indicated that it could provide a compa-

rable "drop in replacement" for the 1040–100 display—the 1040–725 display.[14] Atlantech marketed the new display to its customers as replacements for the 1040–100 displays.[15] In February of 2006,[16] Atlantech purchased 201 of the 1040–725 displays from American Panel.[17] The parties executed the transaction pursuant to an MOA and incorporated agreements similar to those in the 1040–100 transaction, including a Support Agreement that had the "Data Warehouse Documents" provision.[18]

On January 19, 2006, however, American Panel informed Atlantech that the new 1040–725 displays could not operate as "drop in replacements" for the 1040–100 displays.[19] The 1040–725 displays were "larger, configured differently, and most importantly, projected the image upside-down." [20]

In March of 2006, American Panel indicated that it could no longer deliver 1040–100 displays or replace them with comparable equipment unless Atlantech took certain steps. Specifically, American Panel stated that it needed certain LCD glass from a glass manufacturer to produce the 1040 displays, and requested that Atlantech pre-pay for 1,000 pieces of this glass and wait at least 10 months for delivery.[21]

10. *See id.*, Ex. A at 49 (emphasis in original).

11. *See* Bellin Summ. J. Aff. ¶ 8; Aff. of Nathan Bellin in Supp. of Application for Prelim. Inj. ¶ 7 ("Bellin Prelim. Inj. Aff.") [# 31].

12. Bellin Prelim. Inj. Aff. ¶ 8. Apparently, on August 8, 2003, American Panel began discussing a new line of displays at an industry event—the 1040–500s. *See* Second Amended Compl. at 7. The 1040–500s purportedly had the same form, fit, and function as the APC 1040–100 displays, offered improved performance, and cost less than the APC 1040–100 displays. *See id.* at 7–8. It also appears, however, that American Panel, did not proceed to manufacture the new displays. *See id.* at 8.

13. Bellin Prelim. Inj. Aff. ¶ 8.

14. *Id.* at ¶ 9.

15. *See id.* at ¶ 10.

16. Atlantech apparently submitted the purchase order in December, which was modified in January, and finally accepted in February. *See* Bellin Summ. J. Aff. ¶ 9.

17. *See* Purchase Order dated Jan. 29, 2006, Ex. B to Bellin Summ. J Aff. [# 92–3].

18. *See* Bellin Prelim. Inj. Aff. ¶ 9.

19. *See id.* at ¶ 12.

20. *Id.*

21. *See id.* at ¶ 13. Apparently, American Panel did not have the necessary LCD glass in

In May of 2006, American Panel agreed to correct the upside-down issue in the 1040–725 displays.[22]

During the rest of 2006 and early 2007, however, Atlantech and its customers encountered numerous difficulties with the new 1040–725 displays, both with a tester prototype as well as the regular units that American Panel eventually delivered.[23]

### C. Assets of American Panel Sold to APC Acquisition Corporation

On January 29, 2007, American Panel sold its assets to Defendant APC Acquisition Corp., Inc., ("APC") pursuant to an Asset Purchase Agreement,[24] the details of which will be discussed below.

### D. Atlantech's Request for Data Warehouse Documents

Around February 28, 2007, Atlantech's counsel sent a letter to American Panel and APC,[25] demanding the transfer of Data Warehouse Documents for both the APC 1040–100 displays and APC 1040–725 displays to Atlantech.[26] In relevant part, the letter read as follows:

> Under the Product Support Agreements incorporated into the above-referenced purchase orders, APC was obligated to create and maintain "Data Warehouse Documents" for APC 1040–AMLCDs delivered to Atlantech under each such purchase order. Based on recent statements made by APC's representatives and Bill Dunn, APC has discontinued production of the APC 1040–AMLCDs delivery under Purchase Order No. 30308 and is refusing to service and produce additional APC 1040–AMLCDs under Purchase Order No. 61109. Accordingly, Atlantech hereby demands that APC, its successors and assigns, transfer to Atlantech the Data Warehouse Documents as provided under Product Support Agreements ¶ 7.1.2.[27]

APC did not respond to the letter.[28]

### E. Note on Atlantech's Purchase of Other Displays from American Panel

Atlantech purchased additional displays from American Panel pursuant to agreements similar to the 1040–100 MOA and incorporated agreements. For example, on September 18, 2003, Atlantech purchased 103 APC 890–100 LCD displays,[29] and on July 1, 2005,[30] Atlantech ordered 153 APC 890–500 displays.[31] The record, however, on these purchases is less developed, and analysis of these transactions is unnecessary to the outcome in this matter.

---

stock, at least in a sufficient amount, and the glass manufacturer discontinued this particular type of glass. *See id.*

22. *See id.* at ¶ 14.

23. *See id.* at ¶¶ 15–18, 20. The record on these difficulties is limited, as is the record on American Panel and APC's response to these difficulties.

24. *See* Asset Purchase Agreement, Ex. A to Aff. of Michael G. Andrews in Supp. of Mot. for Partial Summ. J. ("Asset Purchase Agreement") [# 91–2–11].

25. *See* Aff. of Irwin B. Schwartz in Supp. of Application for Prelim. Inj. ¶ 1 ("Schwartz Aff.") [# 32–1].

26. *See* Letter from Irwin B. Schwartz to APC (Feb. 28, 2007), Ex A to *id.* [# 32–2].

27. *Id.*

28. *See* Schwartz Aff. ¶ 3 [# 32–1].

29. *See* Memorandum of Agreement between Atlantech and American Panel Corporation, Ex C to Bellin Summ. J. Aff. [# 92–4–5]. Although Atlantech reports that the parties entered into this MOA on November 9, 2002, see Bellin Summ. J. Aff. ¶ 10, the MOA is dated September 18, 2003.

30. Bellin Summ. J. Aff. ¶ 10.

31. *See* Purchase Order, Ex D to Bellin Summ. J. Aff. [# 92–6].

Accordingly, this court focuses on the 1040 transactions.

## Procedural Background

On February 21, 2007, Atlantech filed suit against Defendants American Panel, Universal and APC for breach of warranty, breaches of contract and negligent misrepresentation.[32]

On October 2, 2007, following two amendments to the Complaint, Defendants filed Answers to the Second Amended Complaint, and APC filed a Counterclaim against Atlantech.[33] On November 1, 2007, however, by agreement of APC and Atlantech, this court dismissed the Counterclaim with prejudice.[34]

On April 23, 2007, Atlantech filed an *Application for Preliminary Injunction* seeking access to the Data Warehouse Documents,[35] which this court eventually consolidated with a hearing on the merits. On June 25, 2007, this court ordered Defendants to turn over the Data Warehouse Documents to the court for an *in camera* inspection.[36]

On November 1, 2007, Atlantech filed a *Motion for Partial Summary Judgment* on the issue of whether the contractual obligations were assigned from American Panel to APC.[37] On November 27, 2007, APC opposed Atlantech's *Motion* and filed a cross *Motion for Summary Judgment,* and Universal filed its own cross *Motion for Summary Judgment.*[38]

After replies and surreplies, this court held a hearing on December 19, 2007. Without objection from the Parties, this court indicated that it would rule on the merits, and took all matters under advisement.

## Discussion: Summary Judgment

### A. Legal Standard for Summary Judgment

A court may grant summary judgment when the moving party has shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [39] The court must examine the facts in the light most favorable to the non-moving party, resolving any reasonable inference in that party's favor.[40] Summary judgment may enter when a plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial.[41]

---

32. *See* Complaint [# 1]. Atlantech also alleged that APC and Universal intentionally interfered with contractual relations. *See id.*

33. *See* American Panel and Universal's Answer [# 74]; APC's Affirmative Defenses and Answer to Plaintiff's Second Amended Complaint and Counterclaims [# 75].

34. *See* Judgment [# 93].

35. Atlantech's *Application for Preliminary Injunction.* APC filed a *Motion to Strike* relating to certain paragraphs in one of the affidavits filed in support of Atlantech's motion. *See Motion to Strike "Affidavit of Nathan Bellin in Support of [Atlantech's] Application for Preliminary Injunction".* This *Motion* is DENIED.

36. *See* Order Granting Expedited Discovery [# 52].

37. Atlantech's *Motion for Partial Summary Judgment.*

38. APC's *Motion for Summary Judgment;* Universal's *Motion for Summary Judgment.* American Panel signed Universal's *Motion. See id.* at 2.

39. Fed.R.Civ.P. 56(c).

40. *Dasey v. Anderson,* 304 F.3d 148, 153 (1st Cir.2002).

41. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## B. Assignment of the Atlantech Contracts

Here, the relevant inquiry solely involves the terms of the MOAs and incorporated agreements. Consequently, this is a question of law for the court to resolve, and Atlantech is entitled to judgment as a matter of law.

### 1. The Asset Purchase Agreement

As noted above, American Panel sold its assets to APC via an Asset Purchase Agreement. This court, first of all, must decide whether the rights and obligations of the Atlantech contracts were assigned to APC as part of this transaction, or whether these rights and obligations remain with American Panel.

Atlantech's *Motion for Partial Summary Judgment* seeks "to establish that APC Acquisition Corporation, Inc. is the assignee of the contractual obligations owed by ... American Panel Corporation to Atlantech."[42] In turn, APC's *Motion for Summary Judgment* seeks a determination that APC did not assume any of the Atlantech contracts.[43]

### i. Note on the Applicable Law

■ APC asserts that Georgia law governs interpretation of the Asset Purchase Agreement, and applies Georgia law in its briefs on the assignment issue.[44] In support, APC notes that the Asset Purchase Agreement has a provision entitled "Governing Law, Venue," which states that the agreement "will be governed by and construed in accordance with the laws of the State of Georgia without regard to conflicts of law principles."[45] APC also notes that the parties executed the agreement in Georgia.[46] On the other hand, without arguing for the application of Massachusetts law, Atlantech utilizes Massachusetts contract law in its briefs.[47]

■ This court holds that the choice of law provision controls, and Georgia law applies to this court's interpretation of the Asset Purchase Agreement. In any event, however, the choice of law does not affect the analysis, because the law is the same. In Georgia, "[w]here contract language is unambiguous, no construction is necessary and the court must simply enforce the contract according to its clear terms."[48]

---

**42.** Atlantech *Motion for Summary Judgment* at 1. APC argues that Atlantech does not have standing to pursue these claims because it is a third-party beneficiary to the Asset Purchase Agreement, and Section 10.14 of the agreement explicitly prohibits third-party beneficiaries. *See* APC's Brief in Supp. of its Mot. for Summ. J. at 6–7 ("APC Summ. J. Brief") [# 105]; APC's Sur–Reply Brief in Opp. to Pl.'s Mot. for Partial Summ. J. and in Further Supp. of its Mot. for Summ. J. at 1–6 [# 110]. These set of circumstances, however, do not present a third-party beneficiary situation, because Atlantech seeks the performance of rights it directly contracted for under its contracts.

**43.** *See* APC Summ. J. Brief.

**44.** *See id.* at 5–6.

**45.** *See id.* at 5; Asset Purchase Agreement at 35–36.

**46.** *See* APC Summ. J. Brief at 5.

**47.** Atlantech later noted, however, that "Massachusetts and Georgia law are virtually identical in their rules of contractual interpretation." Atlantech's Mem. in (1) Further Supp. of Atlantech's Mot. for Summ. J. and (2) Opp. to APC Acquisition's Mot. for Summ. J. at 3 ("Atlantech Reply") [# 109].

**48.** *Caswell v. Anderson,* 241 Ga.App. 703, 527 S.E.2d 582, 582 (2000). *See also id.* at 584 ("Interpretation of a contract involves three steps. First, the court decides if the contract language is unambiguous, and if so the court enforces the contract's clear terms. Second, if the contract is ambiguous, the court must apply the rules of contract construction to resolve the ambiguity. And third, if the ambiguity remains after use of the construction rules, the meaning of the contract must be decided by a jury.") (internal citations omitted).

Likewise, in Massachusetts, "an unambiguous agreement must be enforced according to its terms." [49]

### ii. The Assignment

■ Here, the relevant terms of the Asset Purchase Agreement are unambiguous, and several important provisions demonstrate that the Atlantech contracts were fully assigned to APC.

First, APC purchased American Panel's rights in *all* contracts and purchase orders:

1. Sale of Assets

1.1 Transfer of Assets. On and subject to the terms and conditions set forth in this agreement, at the "Closing" ..., Seller shall sell (or shall cause, in the case of certain Intellectual Property, Parent to sell) to Buyer and Buyer shall purchase from Seller (or Parent, as applicable) *all of Seller's* (or Parent's as applicable) right, title and interest in *all of the assets and rights owned,* held for or used in the conduct of or in connection with the Business, other than the Excluded Assets (collectively, the "Purchased Assets"), including, but not limited to:

...

(d) *All* of [American Panel's] rights ... in *all* leases, *contracts,* vendor contracts, *purchase orders, sales orders,* rights, warranties, licenses, permits, agreements and other commitments relating to the Business, *including but not limited to* those set forth on Schedule 1.1(d) (collectively, the "Assumed Contracts").[50]

Even though the Atlantech contracts are not specifically listed on Schedule 1.1(d),[51] the above provision clearly indicates that APC assumed all contracts, not just the contracts listed on Schedule 1.1(d). Accordingly, Atlantech's contracts with American Panel constitute part of APC's "Assumed Contracts."

Second, although the Asset Purchase Agreement specifically excludes certain assets and contracts from the transfer, the schedules of excluded assets and contracts do *not* include American Panel's contracts or obligations with respect to Atlantech.[52]

Lastly, the Asset Purchase Agreement expressly provided that the assignment of contracts included the liabilities and obligations under those contracts: [53]

1.3 Assumption of Liabilities. At the Closing, Buyer will assume and pay, perform and discharge in accordance with their respective terms: (i) *the liabilities under the Assumed Contracts regardless of whether such liabilities accrued or arose before or after the Closing Date;* (ii) the liabilities set forth on Schedule 1.3; (iii) *any and all warranty obligations of Seller arising prior to or after the Closing Date* (whether pursuant to an Assumed Contract or otherwise); (iv) liabilities for the Closing Payroll Expenses; and (v) the principal, interest and any other amounts due under the Dunn Note (collectively the "Assumed Liabilities"). Other than the Assumed Liabilities, Buyer does not assume and shall not in any way be or become liable for, and Buyer does not assume or agree to pay, perform or dis-

---

**49.** *Schwanbeck v. Federal–Mogul Corp.,* 412 Mass. 703, 592 N.E.2d 1289, 1292 (Mass.App. 1992).

**50.** Asset Purchase Agreement at 1–2 (underline in original, bold removed, italics added).

**51.** *See id.* at Schedule 1.1(d).

**52.** *See, e.g., id.* at Schedule 1.2(f) and Schedule 1.2(i).

**53.** Generally, an assignment of a contract is both an assignment of the rights under a contract as well as the delegation of all duties under that contract, unless there is proof of intentions otherwise. *See, e.g.,* Restatement (Second) of Contracts at § 328(1).

charge any debt, claim, lien, obligation, duty, contract, agreement, tax or liability of Seller, known or unknown, contingent or otherwise of any kind or nature, whether or not set forth on the Schedules hereto and whether or not related to the Business or the Purchased Assets (collectively, the "Excluded Liabilities").[54]

Accordingly, regardless of whether certain contracts were assumed, the agreement obligated APC to perform all of American Panel's warranty obligations under any of American Panel's contracts, including the Atlantech contracts.[55] Moreover, because the Atlantech contacts qualify as "Assumed Contracts" under provision 1.1(d), APC also assumed all of the liabilities under those contracts.

The unambiguous terms of the Asset Purchase Agreement establish that American Panel fully assigned all of its contracts with Atlantech to APC. Accordingly, Atlantech's *Motion for Partial Summary Judgment* on the assignment issue is ALLOWED, and APC's *Motion for Summary Judgment* is DENIED.

### 2. Note on Non–Assignment Clauses

APC asserts that Atlantech's contracts with American Panel contain non-assignment clauses that prevent the contracts from being assigned.[56] This argument fails for two reasons.

■ First, although the MOA and incorporated agreements for the 890 displays purchased by Atlantech contain a non-assignment clause,[57] the executed versions of the 1040 MOAs and incorporated agreements—the operative agreements here—do not.[58]

■ Second, non-assignment clauses generally do not prevent contracts from being assigned.[59] Instead, the obligor may have a cause of action for damages against the assignor for breach of the non-assignment clause.[60]

### 3. American Panel and Universal Avionics

■ Because the Atlantech contracts were assigned from American Panel to APC, American Panel cannot incur any liability under these contracts. Universal, therefore, as American Panel's parent company, cannot incur any liability because its subsidiary has no liability. As such, Universal's *Motion for Summary Judgment* is ALLOWED as to Counts I,

---

**54.** Asset Purchase Agreement at 3 (underline in original, bold removed, italics added).

**55.** APC does not contest its responsibility to provide warranty service on the Atlantech displays. *See, e.g.,* APC's Summ. J. Brief at 4.

**56.** *See id.* at 8–9.

**57.** The incorporated Purchase Agreement for the 890 displays contains a provision that reads, in part, as follows: "None of the Parties shall assign its rights or delegate its duties under the present Contract without the prior written consent of the other Party." *See* Purchase Agreement at 9 of 13, part of Ex. C to Bellin Summ. J. Aff. [# 92–5].

**58.** Apparently, APC previously produced an unexecuted Purchase Agreement that contained a non-assignment clause. *See* Atlantech's Mem. of Law in Supp. of Mot. for Partial Summ. J. at 13 n.7 ("Atlantech Summ. J. Mem.") [# 90]. The executed Purchase Agreement, however, contains no such clause.

**59.** Indeed, APC provides no citations to support its position on this issue.

**60.** *See, e.g.,* Restatement (Second) of Contracts § 322(c)(2) ("A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested . . . (b) gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective.").

II, III and IV of the Second Amended Complaint.[61]

## Discussion: Breach of Contract and Relief

After determining that APC assumed the Atlantech contracts from American Panel, this court now holds that APC breached its obligations under the 1040–100 MOA and incorporated agreements.

### A. The Standard

To establish a breach of contract under Massachusetts law, the plaintiff must demonstrate that: (1) a valid, binding agreement exists; (2) the defendant breached the terms of the agreement; and (3) the plaintiff suffered damages from the breach.[62]

### B. Valid and Binding Agreements

First, there is no dispute that the MOAs for the 1040 displays, along with the incorporated documents, constituted valid and binding contracts between American Panel and Atlantech. Because the Asset Purchase Agreement validly assigned the contracts from American Panel to APC, these contracts are now binding on APC as well.

### C. Breach of Agreements

Second, APC has clearly breached the terms of the 1040–100 MOA and incorporated agreements. These documents obligate APC to produce and support the displays for a minimum of ten years (December 31, 2012), provide warranty service, and provide additional support for the displays.[63] Moreover, the Support Agreement specifically provides that American Panel would create for Atlantech (or the end user) Data Warehouse Documents for the displays. If American Panel, and now APC, discontinued *or* failed "to continue either servicing or production," the Data Warehouse Documents would be turned over.[64]

Here, it is undisputed that American Panel discontinued (or "failed to continue ... *production*") the 1040–100 line of displays in 2004 or 2005.[65] Moreover, after acquiring American Panel's assets, APC never resumed production of the 1040–100 displays.[66] The discontinuation of the product line directly triggers the Data Warehouse Documents provision in the 1040–100 MOA and incorporated agreements.[67] Accordingly, as soon American Panel ceased production of the displays, it should have turned over the 1040–100 Data Warehouse Documents to Atlantech.[68] Be-

---

61. Counts V and VI will be addressed later.

62. *Brooks v. AIG SunAmerica Life Assur. Co.,* 480 F.3d 579, 586 (1st Cir.2007) (*citing Michelson v. Digital Fin. Servs.,* 167 F.3d 715, 720 (1st Cir.1999)). Atlantech and APC agree that *Michelson* is the appropriate standard for breach of contract analysis. *See* Atlantech's Mem. of Law in Supp. of Application for Prelim. Inj. at 9–10 ("Atlantech Prelim. Inj. Mem.") [# 30]; APC's Mem. in Opp. to Pl.'s Application for Prelim. Inj. at 7 ("APC Prelim. Inj. Opp.") [# 42].

63. *See* Product Specification, Ex. A at 21; Support Agreement, Ex. A at 53. As noted, APC does not contest its responsibility to provide warranty service on the Atlantech displays.

64. *See* Support Agreement, Ex. A at 49.

65. APC argues that it "has never produced and thus has never stopped producing" the 1040–100 display. APC Prelim. Inj. Opp. at 3. It is undisputed, however, that *American Panel* stopped producing these displays.

66. *See id.*

67. In addition to triggering the Data Warehouse Documents provision, the discontinuation breaches the "Length of Product Availability" provision of the Support Agreement, in which American Panel agreed to produce the displays until December 31, 2012. *See* Support Agreement, Ex. A at 53.

68. Atlantech purchased the displays, and now seeks the documents to perform service work on the displays. Accordingly, Atlantech may be considered the "customer" or "end user"

cause APC has not turned over the documents after assuming the Atlantech contracts, APC is in breach of its obligations under the Data Warehouse Documents provision.

Atlantech argues that APC also triggered the provision when it failed to service the 1040–100 displays properly.[69] The discontinued production of the displays, however, independently suffices to trigger the Data Warehouse Documents provision.[70] Accordingly, analysis of APC's service work on the 1040–100 displays is not required.

## D. Damages

■ Lastly, Atlantech has established damages as a result of APC's breach of the 1040–100 MOA and incorporated agreements. Atlantech requires access to the Data Warehouse Documents to fulfill its obligations to its customers.[71] Without these documents, Atlantech has incurred substantial costs, such as expenditures to address the problem of not having replacement monitors; resources and time in attempting to repair the monitors itself, including trying to determine the cause of problems and obtain recommendations on repairs; and the costs to Atlantech's business of not being able to fulfill its con-

tracts,[72] which will be addressed in more detail below.

## E. Specific Performance

■ In order for a court to order specific performance, a plaintiff must establish that: (1) an adequate remedy at law is unavailable; and (2) the practical burdens of enforcement are not disproportionate to the advantages gained.[73] When examining the proportionality of the burdens and the advantages, courts must ensure that the terms of the contract "are sufficiently definite to provide the basis for an appropriate order."[74] Moreover, generally, "a court will not compel performance if a substantial part of the return performance has not been rendered[.]"[75] Lastly, the court should consider difficulty in enforcement or supervision, and general principles of fairness and public policy.[76]

### 1. No Adequate Remedy at Law

■ Atlantech has no adequate remedy at law. First, one of the only ways, if not the only way, to service existing displays is to have access to the intellectual property underlying the design and function of these displays. This information is not publicly available, and exists only in the form of schematics, designs and numerous

---

under this provision, and the documents must be turned over to Atlantech.

69. *See* Atlantech's *Application for Preliminary Injunction* at 3–4; Atlantech Prelim. Inj. Mem. at 6.

70. The provision requires APC to turn over the documents if the product is discontinued *or* APC fails "to continue either servicing or production." *See* Support Agreement, Ex. A at 49.

71. *See, e.g.,* Bellin Prelim. Inj. Aff. ¶ 38.

72. *See, e.g., id.* at ¶¶ 28, 29, 31, 36–38.

73. *See ER Holdings, Inc. v. Norton Co.,* 735 F.Supp. 1094, 1103 (D.Mass.1990); *Sanford v. Boston Edison Co.,* 316 Mass. 631, 56

N.E.2d 1, 3 (1944) ("where damages are an inadequate remedy and the nature of the contract is such that specific enforcement of it will not involve too great practical difficulties, equity will grant a decree of specific performance."). *See also generally,* E.A. Farnsworth, *Contracts* § 12.7 ("In addition to the adequacy test, a number of other limitations restrict the availability of specific performance and injunction as contract remedies.").

74. Farnsworth, *supra,* § 12.7.

75. *Id.*

76. *See id.*

technical specifications and documentation in the Data Warehouse Documents.[77]

For example, with respect to the displays that are currently in operational airplanes, "Atlantech found that it is impossible to repair and maintain these displays without the Data Warehouse Documents."[78] Additionally, "It would be impossible to replicate the procedures that are required to test the performance of these highly complex parts...."[79] Moreover, without the documents, "[i]t would be difficult, if not impossible," to (1) "ensure that all technical requirements are met;" (2) "diagnose and repair displays covered both during and after warranty;" and (3) "replicate APC displays through a new glass manufacturer ... as the calibration, measurement and timing data in these documents are vital to such glass manufacturing."[80] Accordingly, Atlantech requires access to the Data Warehouse Documents to fulfill its obligations to its customers.

Second, if Atlantech cannot perform its obligations to its customers, the company will suffer significant economic harm, beyond what it has already suffered.[81] Indeed, according to the Atlantech's president, Atlantech may lose its entire business as a result of APC's breach:

> American Panel's and APC Acquisition's refusal to honor the Agreement required Atlantech to spend significant time and resources to identify manufacturers in order to attempt to mitigate American Panel's breaches. This time-consuming mitigation process has utilized a vast majority of Atlantech's resources and severely restricted its ability to pursue new leads and new contracts. To conserve resources for the mitigation effort, Atlantech was forced to suspend employee salaries. *Atlantech's business operations will no longer be able to operate if it is forced to continue these mitigation efforts, which cannot be matched by revenue streams without the Data Warehouse Documents.*[82]

This type of damage constitutes irreparable harm.[83]

## 2. Burdens Not Disproportionate

■ The burdens of requiring APC to specifically perform and turn over the Data Warehouse Documents are not disproportionate to the advantages gained. The terms of the agreement pertaining to the Data Warehouse Documents are definite.[84] Indeed, this is exactly what the Parties contemplated in the event of American Panel, and now APC, discontinued or failed to service the displays.

Additionally, there are no questions of owed performance on the part of Atlantech. Also, this is also a fair provision, one in which American Panel had a choice: If American Panel discontinued or could not

---

77. *See* Bellin Prelim. Inj. Aff. ¶ 27.

78. *Id.* at ¶ 29.

79. *Id.* at ¶ 30.

80. *Id.*

81. The company will also incur significant costs to its reputation. *See, e.g., id.* at ¶¶ 38, 34.

82. *Id.* at ¶ 36 (emphasis added). *See also id.* at ¶ 33 ("Atlantech's very existence as a business depends on meeting its pending contractual commitments.").

83. *See, e.g., Tri–Nel Mgmt., Inc. v. Bd. of Health*, 433 Mass. 217, 741 N.E.2d 37, 46 (2001) ("Economic harm alone ... will not suffice as irreparable harm unless the loss threatens the very existence of the movant's business.") (internal citations and quotations omitted).

84. Consequently, there is no inability "to provide the basis for an appropriate order." Farnsworth, *supra*, § 12.7.

or would not service the displays, Atlantech would be given the Data Warehouse Documents. There are also no public policy concerns.

Lastly, enforcing the contract provision here is simple: APC has to turn over a small set of documents to Atlantech. This court has a copy of these documents, and could monitor compliance with little difficulty.

### 3. Specific Performance Ordered

 Accordingly, specific performance is an appropriate and necessary remedy here. Pursuant to the terms of the 1040 MOAs and incorporated agreements, APC is ordered to turn over the Data Warehouse Documents for the 1040–100 displays to Atlantech.

### F. Atlantech's Request for Injunctive Relief

Atlantech seeks that the court "[e]njoin APC from breaching the support agreement by ordering APC to provide the Data Warehouse Documents to Atlantech." [85] All of the reasoning in the specific performance analysis can be ascribed to Atlantech's request for injunctive relief,[86] and the result is the same—APC must turn over the 1040–100 Data Warehouse Documents to Atlantech. Accordingly, this court need not independently analyze Atlantech's request, and Atlantech is entitled to preliminary and permanent injunctive relief as to the Data Warehouse Documents for the 1040–100 displays.

**85.** Atlantech's *Application for Preliminary Injunction* at 4–5.

**86.** *See, e.g., ER Holdings, Inc. v. Norton Co.,* 735 F.Supp. 1094 (D.Mass.1990).

**87.** In view of this court's decision on summary judgment and Atlantech's request for injunctive relief, this court need not reach Atlantech's claims for negligent misrepresen-

### G. Note on the 1040–725 Displays

This court has now held that APC assumed the Atlantech contracts from American Panel. APC, therefore, under the Data Warehouse Documents provision of the 1040–725 Support Agreement, must now either (1) service the 1040–725 displays or (2) turn over the Data Warehouse Documents for the 1040–725 displays to Atlantech. Accordingly, if APC chooses to not provide service on the displays, it must turn over the documents to Atlantech.

### Conclusion

For the foregoing reasons, Atlantech's *Motion for Summary Judgment* is ALLOWED; APC's *Motion for Summary Judgment* is DENIED; and Universal's *Motion for Summary Judgment* is ALLOWED.[87]

Also for the foregoing reasons, Atlantech's request for preliminary [88] and permanent injunctive relief is ALLOWED as follows. APC must turn over the 1040–100 Data Warehouse Documents to Atlantech. With respect to the 1040–725 displays, APC must now either (1) provide service on the displays or (2) turn over the Data Warehouse Documents for these displays to Atlantech.

An Order has issued.

### ORDER

For the reasons in the accompanying Memorandum, this court hereby orders that:

tation and intentional interference. This includes APC's *Motion for Summary Judgment* and Universal's *Motion for Summary Judgment* with respect to these counts.

**88.** Atlantech's *Application for Preliminary Injunction.* As noted above, APC's *Motion to Strike "Affidavit of Nathan Bellin in Support of [Atlantech's] Application for Preliminary Injunction"* is DENIED.

1. With respect to the contract assignment issue:

 a. Atlantech Incorporated's ("Atlantech") *Motion for Partial Summary Judgment* [# 89] is ALLOWED;

 b. APC Acquisition Corporation's ("APC") *Motion for Summary Judgment* [# 98] is DENIED; and

 c. Universal Avionics Systems Corporation's *Motion for Summary Judgment* [# 102] is ALLOWED.

2. Atlantech's request for preliminary[1] and permanent injunctive relief is ALLOWED as follows:

 a. APC shall turn over the 1040–100 Data Warehouse Documents to Atlantech by April 15, 2008.

 b. APC shall either (1) service the 1040–725 displays or (2) turn over the Data Warehouse Documents for the 1040–725 displays.

3. APC's *Motion to Strike "Affidavit of Nathan Bellin in Support of [Atlantech's] Application for Preliminary Injunction"* [# 44] is DENIED.

IT IS SO ORDERED.

---

1. Atlantech's *Application for Preliminary Injunction* [# 29].